UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,

          Plaintiff,

    v.

Shon Alexander,

          Defendant.

Case No. 3:24-cr-279

MEMORANDUM OPINION
AND ORDER

## I. INTRODUCTION

Defendant Shon Alexander seeks to suppress evidence seized during a search of his residence, as well as an evidentiary hearing. (Doc. No. 264). The government filed a brief in opposition to the hearing request and the motion. (Doc. No. 271). Alexander did not file a brief in reply. For the reasons stated below, I deny Alexander's request for a hearing and his motion to suppress.

## II. BACKGROUND

In July 2024, Ronald Brotherton, a Sandusky, Ohio Police Detective and a task force officer with the Toledo Resident Office of the Drug Enforcement Administration, sought a search warrant from Sandusky Municipal Court Judge Erich O'Brien for Alexander's residence, located at 1401 Lindsley Street in Sandusky. (Doc. No. 271-2). Brotherton, along with other law enforcement officers, had obtained information via surveillance and two sources of information indicating Alexander was involved with a narcotics trafficking organization that was under investigation.

A few months earlier, on May 11, 2024, an unnamed individual ("SOI#1") reported to a Sandusky Police Detective that he or she recently observed approximately nine ounces of cocaine at Alexander's residence. Ten days later, investigators learned from SOI#2 that Alexander asked Mark Castile, Sr. – another suspected member of the narcotics trafficking organization – for "'nine.'" (*Id.* at 6). Brotherton believed Alexander wanted nine ounces of cocaine from Castile Sr., based on his training, experience, and other evidence obtained during the investigation. (*Id.* at 9-10). In seeking the warrant, Brotherton revealed to Judge O'Brien that "SOI#2" in fact was a series of recorded wire communications obtained pursuant to a Title III warrant authorized by my colleague, Senior United States District Judge Jack Zouhary.[1] (Doc. Nos. 271-1 and 271-3).

The following day, Alexander told Castile Sr. he had between $600 and $1,000 to give Castile Sr. (Doc. No. 271-2 at 7). Castile Sr. intended to ask his girlfriend, Alycia Cross, to pick up the money from Alexander. (*Id.*). Investigators learned Castile Sr. frequently provided Alexander with nine ounces of cocaine at a time, and Alexander would pay Castile Sr. after he sold the cocaine. (*Id.*).

On May 30, 2024, investigators executed search warrants at several residences in the Sandusky area connected to the drug trafficking organization, including the house of Castile Sr.'s son. Later that day, Castile Sr. called Alexander and told him Cross would meet Alexander to give him something Castile Sr. wanted Alexander to hold onto for Castile Sr. (*Id.*). Brotherton believed Castile Sr. wanted Alexander to store contraband for Castile Sr. because Castile Sr. was concerned that his residence might be searched as well. (*Id.*).

Castile Sr. called Alexander again on June 8, 2024, and told him that Cross would meet with Alexander to pick up money Alexander owed to Castile Sr. (*Id.*). Later that day, investigators

---

[1] I will omit further references to "SOI#2" while discussing information obtained through the wiretap.

2

observed Cross park her vehicle near Alexander's residence. (*Id.*). They then observed Alexander walk from his residence to Cross's vehicle. (*Id.*).

A little over a month later, on July 12, 2024, Castile Sr. and Alexander agreed to meet so Castile Sr. could pick up more money from Alexander. (*Id.*). Later that day, investigators, using electronic surveillance, observed Castile Sr.'s vehicle near Alexander's residence. (*Id.*). The same events occurred two days later, around 4:30 p.m. (*Id.* at 7-8).

Around midnight on July 14, 2024, Castile Sr. and Alexander arranged to meet at a bar in Sandusky; Alexander did not want to meet at his residence because "so many people had been 'pulling up' to his house that day and it was accordingly 'hot.'" (*Id.* at 8). Alexander initially suggested meeting in downtown Sandusky, but Castile Sr. told Alexander he did not want to meet downtown or near any police stations "because he was 'loaded' and 'had something'" for Alexander. (*Id.*). Brotherton believed, based on his training, experience, and the course of the investigation, that Castile Sr. had narcotics for Alexander and that Alexander was going to pay Castile Sr. for drugs he previously obtained. (*Id.*).

Through a combination of visual and electronic surveillance, investigators observed Alexander's and Castile Sr.'s vehicles in the same parking lot near the bar. (*Id.*). Alexander exited his vehicle and walked away from the bar before returning to his vehicle. (*Id.*). He then drove to 1401 Lindsley, where he entered the house before exiting again a short time later and driving away. (*Id.*). Brotherton believed Alexander entered his house to drop off the drugs he received from Castile Sr. before leaving again. (*Id.*).

The next day, investigators observed Alexander leave his house and drive to a 7-Eleven in Sandusky. (*Id.*). Once there, they watched a male exit a car, walk to, and enter, Alexander's SUV, before leaving a few minutes later. (*Id.* at 9). Alexander then returned to his residence for a short period before leaving again and driving to a gas station. (*Id.*). Alexander exited his vehicle and met

3

with a different male before walking to a Jeep parked in the gas station parking. (*Id.*). Alexander briefly leaned into the Jeep on the front passenger side before returning to his vehicle and leaving the area. (*Id.*). Based on his training and experience, Brotherton believed both interactions were consistent with a hand-to-hand drug transaction. (*Id.* at 8-9).

Judge O'Brien authorized the search warrant on July 16, 2024, and investigators executed the warrant at 1401 Lindsley Street on the same day. They seized, among other things, a firearm and ammunition, nearly $600 in cash, and suspected powder and crack cocaine. (*Id.* at 12). Alexander subsequently was indicted on charges of conspiracy to distribute and possess with intent to distribute controlled substances, possession of cocaine with the intent to distribute, and use of a communications facility to facilitate a drug trafficking offense. (Doc. No. 18). He now moves to suppress all evidence seized during the search of his residence. (Doc. No. 264).

### III.   ANALYSIS

The Fourth Amendment generally requires law enforcement officers to obtain a warrant, based upon probable cause, before searching a location in which an individual has a reasonable expectation of privacy. *See, e.g., Carpenter v. United States*, 585 U.S. 296, 304 (2018) ("When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.") (further citation omitted).

Probable cause is the "'reasonable grounds for belief'" that evidence of a crime will be found in a certain place or location. *United Stated v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985) (quoting *Illinois*

4

*v. Gates*, 462 U.S. 213, 238 (1983)).  The probable cause inquiry does not require "an 'actual showing' of criminal activity at the targeted location, . . . instead ask[ing] whether officers provided direct or circumstantial support to create 'more than mere suspicion' that contraband will be found at the location in question." *United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (en banc) (quoting ! *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (further citation omitted), and *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (further citation omitted)).

The principles underlying a court's probable cause review are familiar.  The Fourth Amendment requires only that "the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing."  *Gates*, 462 U.S. at 236 (citation omitted) (alteration in original).  An affidavit "should be reviewed in a commonsense – rather than a hypertechnical – manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny."  *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004).  A magistrate judge's probable-cause determination is entitled to "great deference."  *Sanders*, 106 F.4th at 461 (quoting *Christian*, 925 F.3d at 311-12 (further citation and quotation marks omitted)).

Alexander first requests a hearing on his suppression motion.  (Doc. No. 264 at 1).  A defendant seeking to suppress evidence based only upon alleged deficiencies in a warrant affidavit is entitled to a *Franks* hearing only if the defendant makes "a substantial showing that the affidavit in support of the warrant at issue included a false statement, made knowingly or intentionally, or with reckless disregard for the truth" and that the false or misleading statements were material to the probable cause determination.  *United States v. Cruz*, 715 F. App'x 454, 456 (6th Cir. 2017) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).  Alexander has not identified any allegedly false or misleading statement in the warrant affidavit and, therefore, I deny his request for a hearing.

5

Alexander next argues that "the affidavit fails to demonstrate the reliability or credibility of the intercepted communications or sufficiently connect statements to alleged illegal conduct." (Doc. No. 261 at 2). In particular, Alexander argues Brotherton was required to corroborate or verify the information obtained from SOI#2, the Title III wiretap.[2] Alexander analogizes his intercepted phone conversations to anonymous tips, which require police corroboration. (*Id.*) (citing *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000)).

But statements recorded pursuant to a wiretap differ in kind from anonymous tips. The most obvious difference being that the recorded statements are not anonymous. Law enforcement officers have already identified at least one of the participants in the conversation – the individual whose telephone is the subject of the wiretap warrant. In this case, while Castile Sr. was the target of the wiretap, investigators both knew who Alexander was and were able to identify him while he was speaking on the recordings.

Moreover, Alexander has not identified any case in which a court held that investigators are required to demonstrate the reliability or credibility of a defendant's own recorded statements in order to establish probable cause to search the defendant's residence. But even if he had, Alexander's argument still would fail, as investigators did not simply rely on Alexander's recorded statements to apply for a search warrant. Instead, on multiple occasions during the investigation, officers intercepted a phone conversation in which Alexander said he was going to do something or go somewhere, and they then observed Alexander go or do what he previously stated he would. (*See* Doc. No. 271-2 at 7-8). And investigators are permitted to rely on their training and experience to infer that conduct like that in which Alexander engaged likely involved trafficking of illegal narcotics.

---

[2] Alexander does not challenge the wiretap warrant itself. *Cf., e.g., United States v. Poulsen*, 655 F.3d 492, 503-04 (6th Cir. 2011) (discussing and applying required elements of a wiretap application).

*See, e.g., Texas v. Brown*, 460 U.S. 730, 742-43 (1983) (upholding search where an officer relied on his training to conclude a balloon in the defendant's hand likely contained narcotics).

Alexander also argues that the search warrant affidavit does not establish a nexus between his residence and drug trafficking. (Doc. No. 264 at 3-5). This argument is also unpersuasive.

The Fourth Amendment requires a showing that there is "a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)). Brotherton's affidavit plainly established a nexus between 1401 Lindsley and drug trafficking. Two examples are sufficient to support this conclusion.

First, on June 8, 2024, investigators intercepted a phone call in which Castile Sr. told Alexander that Cross would come to Alexander's residence to pick up money from Alexander. They then observed Cross park her vehicle near 1401 Lindsley before Alexander exited his house and walked to Cross's vehicle. Second, on July 15, 2024, investigators twice observed Alexander leave his house and drive to a secondary location where he engaged in an apparent hand-to-hand drug transaction. "Evidence that one leaves a residence, engages in a drug transaction, and then returns into the residence plainly demonstrates a sufficient nexus with the location" to be searched. *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir.), *cert. denied,* 145 S. Ct. 603 (2024) (cleaned up).

Alexander complains investigators did not actually witness drugs or money change hands and contends that this fact demonstrates a lack of probable cause. (Doc. No. 264 at 4-5). But a warrant "'affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added.'" *United States v. Thomas*, 605 F.3d 300, 309 (6th Cir. 2010) (quoting *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc)).

The warrant affidavit contains sufficient evidence to establish a "fair probability" that evidence of a crime would be found at 1401 Lindsley. *United States v. Loggins*, 777 F.2d at 338 (citation and quotation marks omitted). Therefore, I deny Alexander's motion to suppress.

Moreover, even if I were to assume the warrant violated the Fourth Amendment, I conclude the officers executing it relied upon it in good faith. The Supreme Court has held that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984) (internal quotation marks omitted)).

There are "four circumstances in which an officer's reliance on a subsequently invalidated warrant cannot be considered objectively reasonable:

> first, if the issuing magistrate 'was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;' second, if 'the issuing magistrate wholly abandoned his judicial role;' third, if the affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' or in other words, where 'the warrant application was supported by [nothing] more than a "bare bones" affidavit,' and, fourth, if the 'warrant may be so facially deficient—*i.e.*, failing to particularize the place to be searched or the things to be seized.'"

*United States v. Neal*, 577 F. App'x 434, 448 (6th Cir. 2014) (quoting *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996)).

Alexander argues officers could not have relied on the warrant in good faith because it failed to establish a nexus between his residence and suspected drug trafficking and relied on "uncorroborated wiretap statements, render[ing] the warrant facially deficient." (Doc. No. 264 at 6). But as the Sixth Circuit has repeatedly held, a warrant is facially deficient only if it lacks vital information such as the identity of the place to be searched or the type of contraband which might be found there. *See, e.g., Neal*, 577 F. App'x at 448. The search warrant affidavit in this case clearly states that required information. Therefore, I deny Alexander's good-faith challenge as well.

8

## IV. CONCLUSION

I conclude Alexander failed to carry his burden to show there was a lack of probable cause to support the warrant to search his residence. Therefore, and for the reasons set forth above, I deny his request for a hearing and his motion to suppress. (Doc. No. 264).

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge